WILLIAMSBURG WAX MUSEUM,
INC., Appellant,

v.

HISTORIC FIGURES, INC., et al.

NATIONAL CIVIL WAR WAX
MUSEUM, INC., Appellant,

v.

HISTORIC FIGURES, INC., et al.

NATIONAL SOUVENIR CENTER, INC.,
d/b/a American Historical Wax
Museum, et al., Appellants,

v.

HISTORIC FIGURES, INC., et al.

Nos. 85–5964, 85–5965 and 85–5975.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 11, 1986.
Decided Jan. 27, 1987.

Nelson Deckelbaum and Jerome S. Wagshal, Washington, D.C., for appellants.

David J. Cynamon, Washington, D.C., for appellees.

Before WALD, Chief Judge, MIKVA, Circuit Judge, and LEIGHTON,* Senior District Judge.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

These three consolidated anti-trust cases are before this court for the second time. The underlying litigation has been in progress for almost a decade. Appellants are three wax museums: Williamsburg Wax Museum ("Williamsburg"); National Civil War Wax Museum ("Gettysburg"); and National Souvenir Center ("Gatlinburg"). They appeal four separate actions of the district court: its denial of appellant Gatlinburg's motion for leave to amend its complaint; its order increasing the post-judgment interest rate on an earlier judgment entered against all three appellants; its method of calculating holdover rent owed by Gatlinburg for property leased from appellee Lynch; and its ultimate dismissal of Gatlinburg's antitrust claims on appellee's motion for summary judgment.

For the reasons stated below, we affirm the district court in all respects, except for its order amending the rate of post-judgment interest, which we vacate.

## I. BACKGROUND

Our opinion in the first appeal of this case spells out the facts in great detail. *See National Souvenir Center, Inc. v. Historic Figures, Inc.*, 728 F.2d 503 (D.C. Cir.1984), *aff'g in part and vacating and remanding in part,* 554 F.Supp. 182 (D.D. C.1982), *cert. denied,* 469 U.S. 825, 105 S.Ct. 103, 83 L.Ed.2d 48 (1984). Accordingly, we set forth only those facts which are relevant to the present appeal. As noted above, appellants are three wax museums. Appellee Lynch Display Corporation ("Lynch") manufactures plastic display figures for wax museums, and appellee Earl Dorfman is Lynch's founder and President. Appellee Historic Figures, Inc. ("Historic") is a wax museum with exclusive rights to sell Lynch's figures. Appellee National Historical Museum, Inc. ("National"), a subsidiary of Historic, handled the sale of the Lynch figures.

National sold Lynch figures to appellants Gettysburg (in 1960) and Williamsburg (in 1967), and as part of the sale required both museums to enter into "franchise agreements." These agreements required National to assist them in establishing their museums and required the museums in return to pay National 5% of their gross receipts for a period of twenty years. In 1962, appellant Gatlinburg leased Lynch figures directly from Lynch for a term of approximately twenty years, conditional on its entering into a franchise agreement with National similar to those entered into by the other museums. The lease called for rent of 10% of Gatlinburg's gross receipts, and holdover rent at that same rate if Gatlinburg did not return the figures at the end of the term. Gross receipts were defined as *all* of the proceeds from *any* of the museum's displays or exhibits.

In 1977, appellants filed these antitrust suits. All three appellants claimed that appellees illegally tied the sale or lease of Lynch figures to the franchise agreements, in contravention of the Clayton Act, 15 U.S.C. §§ 12 *et seq.* (1982). (These antitrust claims are not relevant to the instant appeal.) Appellant Gatlinburg further alleged that appellees, through and by their agreements with each other as well as their leasing policies, violated Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2 (1982) (the "monopolization claims"). The Section 1 claim asserted essentially that appellees had combined and conspired to restrain trade in the wax figure market. The Section 2 claim alleged that appellees had monopoly power in the wax figure market, and that they had unlawfully exercised that power by requiring Gatlinburg to lease its figures and to pay "exorbitant" prices. On filing suit, all three appellants stopped paying the fees due under their

---

* Of the United States District Court for the Northern District of Illinois, sitting by designation

pursuant to 28 U.S.C. § 294(d).

franchise agreements, and Gatlinburg stopped paying the rent to Lynch under its lease. Appellees counterclaimed for the money owed under the franchise agreements and the lease.

In 1978, appellees moved for summary judgment on their counterclaims and on all of appellants' antitrust claims. In 1981, after limited discovery, the district court denied summary judgment on the antitrust claims, finding that there were material questions of fact in controversy. Memorandum Order, May 19, 1981. The court found appellants liable on appellees' counterclaims, *id.*, and later it awarded damages on those counterclaims, ordering appellants to pay appellees all of the money due under the franchise and lease agreements as well as pre- and post-judgment interest calculated at six percent, Order and Final Judgment, September 3, 1982.

Thereafter, appellees moved for summary judgment on appellants' tying claims, arguing that they were barred by the Clayton Act's four year statute of limitation, 15 U.S.C. § 15b. The district court granted the motion. *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.,* 554 F.Supp. 182 (D.D.C.1982). This left only Gatlinburg's monopolization claims, *id.* at 183 n. 5, 186 n. 16, and appellees moved for summary judgment on these claims also, again relying on a statute of limitations rationale. The district court ruled in appellees favor, dismissing the lease claims. Memorandum, Jan. 31, 1983.

Appellants then appealed the dismissal of all of their antitrust claims, as well as several portions of the damages award, to this court. *National Souvenir Center, supra,* 728 F.2d 503. We affirmed the dismissal of the tying claims, *id.* at 513, but found that despite our reservations about the substantive validity of the claims, "the statute of limitations [was] not a proper ground for dismissing the monopolization claims," *id.* at 513–14. We affirmed the challenged portions of the damages award in all relevant respects. *Id.* at 514–17. In addition, we noted that Gatlinburg had raised a new issue—alleging that appellees'

leasing policies, which included resale restrictions, were designed to preclude a secondhand market in Lynch figures. We left it to the district court to decide whether or not to entertain this belated attempt to raise this issue. *Id.* at 513 n. 8.

The facts discussed above set the stage for a host of motions by both sides. At issue in this appeal is the district court's disposition of four of those motions.

First, upon remand, Gatlinburg moved to amend its complaint to include allegations concerning the preclusion of a secondhand market. The district court denied this motion. Memorandum Order, June 25, 1985.

Meanwhile, appellants paid the judgment on appellees' counterclaims in full, including interest. Appellees subsequently discovered that the statutory post-judgment interest rate at the time that damages were awarded was fourteen percent, not six percent. The second motion sought to amend the district court's September, 1982 order, to allow such higher interest. The district court granted appellees' motion. Memorandum Order, May 22, 1985.

The third motion dealt with holdover rent. Because Gatlinburg had not returned the Lynch figures upon expiration of its lease, appellee Lynch moved for an order requiring Gatlinburg to pay holdover rent. The district court granted this motion as well, ordering Gatlinburg to pay holdover rent calculated at 10 percent of its gross receipts, as specified in the lease. *Id.*

Finally, subsequent to further discovery, appellees moved for summary judgment on the only remaining anti-trust claim, which was Gatlinburg's monopolization claim. The district court granted this fourth motion, effectively dismissing the case. Memorandum, August 13, 1985.

## II. ANALYSIS

### A. *Denial of First Motion: Amend the Complaint*

During the first appeal, we noted that Gatlinburg had presented to us allegations that its lease was part of a scheme of

resale restrictions imposed by appellees to preclude the establishment of a secondhand market in Lynch figures, and that these allegations had not been made before the district court and did not appear in Gatlinburg's complaint. *See National Souvenir Center, supra,* 728 F.2d at 513 n. 8. At that time, we stated that we would

> leave it to the district court, which is more familiar with the history of the proceedings in this case and the evolution of Gatlinburg's exact contentions, to decide if this claim is sufficiently related to Gatlinburg's original complaint ... so that Gatlinburg may raise the claim on remand at this late date.

*Id.*

On remand, Gatlinburg moved to amend its complaint to include these allegations. This motion came in late 1984, over seven years after Gatlinburg had filed its initial complaint. The district court denied the motion, finding that the proposed amendment added an entirely new antitrust theory to the case, that it would prejudice appellees by requiring extensive new discovery, and that it would cause a significant delay in resolving "this already protracted litigation." Memorandum Order, June 25, 1985. Gatlinburg now challenges this denial, arguing essentially that the district court's conclusions were erroneous and unsupported by the record.

As an initial point, we note that in our prior opinion we incorrectly stated that Gatlinburg had first raised the issue of preclusion of the secondhand market on appeal. *See National Souvenir Center,* 728 F.2d at 513 n. 8. Apparently, appellant had raised the issue before the district court, albeit six years into the litigation and after summary judgment had been granted for appellees. *See* Memorandum in Support of Motion to Alter, Amend, or Vacate Judgment (with respect to the Gatlinburg lease) 5–6, filed Feb. 10, 1983. Nevertheless, the claim had not been raised in Gatlinburg's original complaint, therefore the issue correctly laid before the district court as a motion to amend the complaint.

■ Fed.R.Civ.P. 15(a) states in relevant part that "a party may amend his pleadings only by leave of the court" and that leave "shall be freely given when justice so requires." It is within the sound discretion of the district court to decide whether to grant such leave. *See, e.g., Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971). Reversal of a district court's decision not to permit amendment is thus appropriate only if there has been an abuse of discretion. *See* 6 Wright & Miller, Federal Practice and Procedure § 1484 (1971). This court has noted that denial is permitted if the amendment would result in delay or undue prejudice to the opposing party, or if a party has had sufficient opportunity to state a claim and has failed to do so. *Doe v. McMillan,* 566 F.2d 713, 720 (D.C. Cir.1977) (citing 3 Moore's Federal Practice ¶ 15.08[4] at 897–900 (1964)), *cert. denied,* 435 U.S. 969, 98 S.Ct. 1607, 56 L.Ed.2d 59 (1978).

■ In the present case, appellant Gatlinburg attempted to raise an entirely new issue by amendment, years after it had filed its original complaint, after the parties had conducted extensive discovery, and after the district court had granted a summary judgment motion against the museum. Gatlinburg offered no explanation for its tardiness. In addition, the secondhand market issue was not related to the issues raised in Gatlinburg's original complaint, and therefore a new round of discovery would have been required. Under these circumstances, when so much time has passed and where the movant has had abundant opportunity over the course of a half-dozen years to raise the issue, the district court's denial of the motion for leave to amend was fully warranted.

The district court's decision is supported by our decision in *Doe v. McMillan, supra,* in which we upheld the denial of a motion to amend under circumstances remarkably similar to those in this case. In *Doe v. McMillan,* the motion to amend came over thirty-eight months after the filing of the original complaint, and the movant had giv-

en no prior indication of the potential change in the theory of the case and had offered no reason for its failure to seek amendment earlier. We stated that

> [w]hen a plaintiff seeks to file an amended complaint this tardily, it is within the sound discretion of the district court, in consideration of the potential for prejudice to the other party and the interest in eventual resolution of the litigation, to deny leave to amend.

566 F.2d at 720 (citations omitted).

Our holding in *Doe v. McMillan* applies with equal force here. Gatlinburg has been extremely tardy in raising the second-hand market issue, and here, as in *Doe v. McMillan,* we do not find that the district court has abused its discretion in denying appellant leave to amend its complaint.

### B. *Granting of Second Motion: Increase in Post-Judgment Interest*

When the district court awarded damages to appellees on their counterclaim for money owed under the franchise agreements and the Gatlinburg lease, Judgment and Order, Sept. 3, 1982, the judgment was in a form submitted by appellees in February, 1982. It provided for post-judgment interest at the rate of six percent, the statutory rate when appellees submitted their proposed judgment in February. However, the controlling statute, D.C. Code § 28–3302, was amended in March, 1982, and the applicable interest rate was actually fourteen percent when the court entered judgment in September. No one raised the issue of the statutory change in the interest rate.

In October, 1984, after the first appeal and our remand to the district court, appellants paid the judgment in full, including interest calculated at six percent. By this time, over two years had passed since entry of the judgment. One month later, appellees apparently realized their oversight and filed a motion asking the district court to amend its earlier judgment to provide for interest of fourteen percent. Appellants opposed this motion as being untimely under Fed.R.Civ.P. 60(b)(1), which establishes

a one year deadline for any motion for relief from operation of a judgment on the grounds of mistake or inadvertence. The district court granted appellees' motion, ordering appellants to pay over $105,000 in additional interest. Memorandum Order, May 22, 1985. The court conceded that the error was due to "inadvertence" but reasoned that post-judgment interest was a "creature of statute" and therefore not subject to judicial modification. *Id.* at 5–6. It stated that, since it was undisputed that fourteen percent was the statutory rate at the time judgment was entered, and since the court in no way intended to limit appellees' recovery to less than the statutory rate, the proper remedy was to amend the judgment to conform with the statute. *Id.* In response to appellants' Rule 60(b)(1) argument, the court stated that it had the power to consider the motion under Rule 60(b)(6), which has no time limit. *Id.* at 6 n. 5.

■ We agree at the outset that post-judgment interest is a creature of statute. *See* 28 U.S.C. § 1961 (1982). The version of Section 1961 in effect at all relevant times stated that such interest "shall be calculated ... at the rate allowed by state law." The state law in question was D.C. Code § 28–3302, which, as previously indicated, provided for six percent interest when appellees submitted their proposed judgment, but which had been subsequently amended and which provided for fourteen percent interest at the time judgment was entered.

■ However, the statutory nature of post-judgment interest does not, in and of itself, compel relief in all circumstances in which a judgment fails to conform to the statute. Under Fed.R.Civ.P. 60(b)(1), a court may relieve a party from a judgment that is based on "mistake, inadvertence, surprise, or excusable neglect," but only on a motion made *within one year* of entry of the judgment. In the instant case, as the district court admitted and as seems readily apparent, the error was based on inadvertence. Thus, Rule 60(b)(1), with its one year time limitation, clearly applied.

The district court attempted to circumvent the apparent harshness of the one year limitation by reading Rule 60(b)(6) as permitting it to act in these circumstances. But the district court's interpretation of Rule 60(b)(6) is contrary to established law. Rule 60(b)(6) permits a court to grant relief from a final judgment for "any *other* reason justifying relief. . . ." (Emphasis added.) The courts have universally interpreted "other" to mean other than the reasons specified in subsections 60(b)(1)–60(b)(5), *see, e.g., Klapprott v. United States*, 335 U.S. 601, 614–15, 69 S.Ct. 384, 390–91, 93 L.Ed. 266 (1949), and it is generally accepted that cases clearly falling under Rule 60(b)(1) cannot be brought within the more generous Rule 60(b)(6) in order to escape the former's one year time limitation. *See, e.g., Gulf Coast Building and Supply Co. v. International Brotherhood of Electrical Workers*, 460 F.2d 105 (5th Cir.1972) (holding that when the district court mistakenly ordered pre-judgment interest and a motion to amend was made more than one year after entry of judgment, no relief was available under Rule 60(b)(6) because Rule 60(b)(1) clearly applied); *see also* Wright & Miller, 11 Federal Practice and Procedure § 2864 (1973). Therefore, because Rule 60(b)(1) plainly applied, and because the motion for relief came over one year after the entry of judgment, we conclude that the district court could not properly entertain the motion, and hereby vacate the district court's order amending its earlier judgment.

Although we find that Rule 60(b)(1) fully and sufficiently supports our decision to vacate the district court's order, we do not view the decision as harsh to appellees. Appellees drafted and submitted the judgment to the district court, so they in fact caused the mistake in the first place. They accepted payment of that judgment without protest, and they did not raise the issue when the case was before this court on appeal the first time. Consequently, they could be deemed to have waived any statutory right to higher interest that they might have had. *See Feaster Trucking Service, Inc. v. Kindsvater, Inc.*, 460 F.2d 180 (10th Cir.1972) (holding that where the proper rate of interest was eight percent but the court ordered six percent, movant had waived right to higher rate by not raising the issue earlier, in its petition for review); *Clinton v. Joshua Hendy Corp.*, 264 F.2d 329 (9th Cir.1959) (holding that where interest was supposed to have run from the date of judgment, but movant never asked for it and had accepted full payment of the judgment without it, movant had forever waived his right to receive it).

Finally, we adamantly reject appellees' attempt to justify the district court's action by denominating the increase payment ordered as "damages for delay." Regardless of whether they might be entitled to such relief, appellees never moved for "damages" (resulting from appellant's delay in satisfying the judgment while the first appeal was pending) and never submitted any evidence of such damages. Moreover, the district court never considered this issue. What was at issue was post-judgment interest.

Interest, like any other item of a judgment, must be sought and awarded. The statutory rate of interest serves as a ceiling; it does not operate as an automatic inflexible award that must accompany every money judgment. The denial effected by Rule 60(b)(1) in these circumstances is not unjust.

### C. *Granting of Third Motion: Award of Holdover Rent*

Gatlinburg leased ninety display figures from Lynch in 1962. The lease explicitly stated that rent would be 10% of the gross receipts, and gross receipts were defined as all proceeds from "any exhibits, or displays located, owned and/or operated by [Gatlinburg] in said premises derived from the operation of said museum." As for holdover rent, the lease stated that if Gatlinburg did not return the figures at the expiration of the lease term, "then the leased figures shall continue to be held and used under and in accordance with the conditions *and on payment of the rentals [specified]*

*in this Agreement....*" (Emphasis added.) Thus, holdover rent was to be equivalent to regular rent. The lease expired by its terms on September 30, 1982.

According to Gatlinburg, the museum experienced a decline in attendance during the mid–1970's, and in response it purchased several more "contemporary" figures (including an Elvis Presley figure as well as a grouping of the Kennedy family) from a source other than Lynch or Historic. Gatlinburg claims that attendance then rose demonstrably.

As noted above, when Gatlinburg and the other museums instituted their antitrust suits, Gatlinburg stopped paying rent to Lynch, and Lynch prevailed in its counterclaim for past rents due. The district court ordered Gatlinburg to pay those rents, using 10% of all gross receipts as defined in the lease as the measure. Order and Final Judgment, Sept. 3, 1982. (The "back-rent decision.") Gatlinburg moved to amend the judgment, arguing in part that it should be permitted to deduct from the calculated rent "such sums as may be fairly attributable to the new [non-Lynch] figures added to the Gatlinburg museum...." The district court denied this motion. Order, Oct. 28, 1982. When appellants brought their first appeal to this court, Gatlinburg attacked some portions of the damages award but did not challenge the back-rent decision. *See National Souvenir Center, supra,* 728 F.2d 503.

At the expiration of the lease, Gatlinburg did not return the figures to Lynch. In December, 1983, Lynch requested the district court to order Gatlinburg to pay holdover rent at the rate of 10% of gross receipts, as defined in the lease. Gatlinburg conceded some liability, but argued again that there should be an adjustment to account for sums attributable to non-Lynch figures. The district court held in favor of Lynch, stating that the issue raised by Gatlinburg had been raised and decided before Gatlinburg's first appeal, and that the law of the case doctrine applied to preclude Gatlinburg from re-litigating the issue on remand. Gatlinburg argues now

that the district court erred in applying law of the case to this dispute.

Under law of the case doctrine, a legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, becomes the law of the case for future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time. *Laffey v. Northwest Airlines, Inc.,* 740 F.2d 1071, 1089–93, 1102–03 (D.C.Cir.1984); *see also* 18 Wright, Miller & Cooper, Federal Practice and Procedure § 4478 (1981); 1B Moore's Federal Practice ¶ 0.404[1] (2d ed. 1984). The doctrine encompasses a court's explicit decisions, as well as those issues decided by necessary implication. *Carpa, Inc. v. Ward Foods, Inc.,* 567 F.2d 1316, 1320 (5th Cir.1978); *see also* 18 Wright, Miller & Cooper, *supra,* § 4478. The purpose of the doctrine is to "maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." 18 Wright, Miller & Cooper, *supra,* § 4478.

Given the facts presented in this case, we find that the district court did not err in applying the doctrine. In its back-rent decision, the district court ordered Gatlinburg to pay back-rent without deduction for rents generated by non-Lynch figures, and denied Gatlinburg's motion to amend in which it requested the court to make such deductions. Underlying this order and the rejection of Gatlinburg's motion to amend was the necessary, implicit decision that the term "gross receipts" as it appeared in the lease meant exactly what the lease said it meant—*all* proceeds derived from *any* exhibits or displays, whether or not they were leased from Lynch. Gatlinburg did not raise or challenge the back-rent decision in its first appeal to this court, when it had the opportunity to do so and when it did attack other portions of the damages award. Thus, the district court's decision became the law of the case.

Gatlinburg's subsequent challenge to the district court's calculation of *holdover* rent presented the exact same legal issue that

had been decided in the back-rent decision—whether "gross receipts" meant all receipts from all displays and exhibits. The holdover rent provision of the lease stated that holdover rent would be the same as regular rent. The back-rent decision conclusively established that regular rent was 10% of *all* receipts. It thus implicitly also determined that holdover rent was 10% of all receipts. Under these circumstances, we find no fault with the district court's determination that the law of the case doctrine applied to preclude Gatlinburg from resurrecting the already settled issue of how to calculate rent under the Gatlinburg lease.

We note here that appellees have asked this court to impose sanctions on Gatlinburg, under Fed.R.App.P. 38, for raising this issue in the instant appeal, arguing that the only purpose of this "belated assertion of the argument" is to delay payment. Appellees have offered no material support for their contention that Gatlinburg's purpose was delay, and the record contains no evidence of bad faith on Gatlinburg's part. We decline to impose sanctions.

### D. *Granting of Fourth Motion: Final Summary Judgment*

The only substantive antitrust issue that remained before the district court after the flurry of activity described above was Gatlinburg's monopolization claim. As noted above, this court had reversed the district court's dismissal of that claim, finding that despite our "extreme skepticism about the substantive validity" of the claim, the statute of limitations grounds articulated by the district court was not a proper grounds for dismissal. *National Souvenir Center, supra,* 728 F.2d at 513–14. Appellees subsequently moved for summary judgment on this claim, this time contending that there was no genuine issue as to any material fact and that they were entitled to judgment as a matter of law. The district court ultimately granted this motion and dismissed the case, Memorandum, Aug. 13, 1985, and Gatlinburg appeals.

We turn first to a procedural argument raised by Gatlinburg. Gatlinburg asserts that, because the district court had denied appellees' first motion for summary judgment, it was precluded from granting summary judgment at a later stage under the doctrine of *res judicata.* This argument is without merit. A subsequent motion for summary judgment based on an expanded record is always permissible. *Brownfield v. Landon,* 307 F.2d 389 (D.C. Cir.), *cert. denied,* 371 U.S. 924, 83 S.Ct. 291, 9 L.Ed.2d 232 (1962). In this case, substantial discovery took place after the denial of appellees' first motion for summary judgment. This discovery enlarged the record. In particular, it added one piece of evidence that was highly material to the antitrust issues presented, and upon which appellees partially relied in their final motion for summary judgment.

At the time of appellees' first motion, the record contained statements made by Shelby Boyd, the founder of the Gatlinburg museum, to the effect that appellees were the *only* source of display figures for wax museums when he was establishing the museum. This statement buttressed Gatlinburg's claim that appellees possessed monopoly power. However, in a deposition taken during discovery after the denial of the first motion for summary judgment, Boyd refuted his earlier statements. In his new testimony, Boyd admitted that he had found a second source for museum figures, but that the second source could not deliver figures for about a year, whereas Lynch could deliver immediately. He stated that, because he had already rented a building to house his planned museum, he chose Lynch as his supplier so that he could begin operations as soon as possible. This later deposition testimony by Boyd, which went to the very heart of Gatlinburg's monopolization claims, sufficiently added to the record to justify the district court's consideration of the later motion.

We turn at last to the final issue presented: whether the district court properly dismissed the case on the final motion for summary judgment. Gatlinburg's monopo-

lization claims contained charges that appellees violated Sections 1 and 2 of the Sherman Act. The Section 2 portion essentially entailed charges that appellees had monopoly power in the wax figure market and that they unlawfully exercised that power to force Gatlinburg to lease Lynch figures and pay exorbitant prices. We read the district court's opinion as premising dismissal of this Section 2 claim on two separate grounds: its conclusion that appellees did not have monopoly power in the relevant market; and its conclusion that even if appellees did have monopoly power, Gatlinburg did not demonstrate that appellees' actions constituted a violation of the antitrust laws. We agree with the district court's holding on both counts.

■ The Supreme Court has defined monopoly power as "the power to control prices or exclude competition." *United States v. duPont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). Boyd's uncontroverted statement that he had found another supplier of wax figures thus seriously undermined Gatlinburg's claim that appellees had monopoly power. Gatlinburg's response is that because Boyd said that the second supplier could not deliver figures for a year, appellees still had a monopoly, albeit one that was limited in time. However, Gatlinburg offers absolutely no authority for the proposition that a seller who can deliver a product sooner than a *known* competitor is a monopolist under the antitrust laws for the period in which he alone is able to deliver. The principal case relied on by Gatlinburg to support its time-limited monopoly theory, *William Goldman Theatres, Inc. v. Loews, Inc.*, 150 F.2d 738 (3d Cir.1945), makes no mention at all of the time-limited rationale. Furthermore, that case is completely inapposite because it involved a single known supplier, whereas in the instant case there were *two* known suppliers. Therefore, we agree with the district court's conclusion that Gatlinburg has not shown that appellees had monopoly power in the wax figure market.

■ Even if we assumed *arguendo* that appellees did have monopoly power, summary judgment was proper under the circumstances presented in this case. A plaintiff must show more than monopoly power in order to establish a Section 2 violation; he must also show that the defendant exercised its power in an anticompetitive fashion. *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1703-04, 16 L.Ed.2d 778 (1966); *see also* 3 P. Areeda & D. Turner, Antitrust Law ¶¶ 612-13 (1978). In this case, the behavior that Gatlinburg is complaining of simply does not constitute anticompetitive conduct prohibited by the antitrust laws.

■ Gatlinburg has claimed that appellees unlawfully exercised their monopoly power by requiring Gatlinburg to pay "exhorbitant" prices under the lease agreement. The district court correctly responded to this charge by noting that an excessive price alone does not establish a violation of the antitrust laws, because imposition of a high price is not, in and of itself, an anticompetitive act. Memorandum, Aug. 13, 1985 at 9 (citing *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir.1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980)).

As for Gatlinburg's further allegations that appellee unlawfully exercised their power by requiring Gatlinburg to lease the figures rather than permitting an outright purchase, the district court found that the lease requirement in this case did not constitute a cognizable antitrust violation. We agree with the conclusion.

In our prior opinion we expressed "extreme skepticism about the substantive validity of this monopoly lease claim based on maintenance of a single lease by an alleged monopolist." *National Souvenir Center, supra*, 728 F.2d at 513. Indeed, we noted that

Appellees' sale of the Lynch figures to other wax museum franchisees seriously undercuts appellants' arguments that appellees relied on the *lease as a mechanism* to discourage replacement of the figures with those of competitors during

the lease term, or that leasing rather than selling significantly affected the market for figures.

*Id.* Despite its submission of evidence of additional leases (between appellees and other museums), appellant gives us no cause to question the appropriateness of our initial skepticism. Gatlinburg has not shown that it was forced to lease the Lynch figures as part of appellees' alleged conspiracy to monopolize the wax museum display figure market.

Leasing requirements, in combination with other practices, can sometimes impede competition and thereby violate the antitrust laws. For example, in *United States v. United Shoe Machinery Corp.*, 110 F.Supp. 295 (D.Mass.1953), *aff'd* 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954) (per curiam), the defendant shoe-making equipment manufacturer used an array of practices, including a lease-only policy, both to keep its customers from looking to other suppliers and to prevent its competitors from entering into the shoe machinery field. The court condemned the defendant's "refusal to sell" practices, finding them to be exclusionary. *See id.* (holding that United's lease provisions violated § 4 of the Sherman Act); *see also Hanover Shoe v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) (holding that same activity violated § 2 of the Sherman Act).

However, *United Shoe* is clearly distinguishable. In the instant case appellees did not have a lease-only policy—they generally sold their figures and in fact had sold them to appellant Gettysburg prior to leasing to Gatlinburg and to appellant Williamsburg subsequently. Furthermore, Gatlinburg has neither alleged nor demonstrated any practices other than the lease requirement (and the high prices, discussed above), whereas in *United Shoe* it was an entire panoply of practices, including a lease-only policy, that the court found to be unlawful. Consequently, we agree with the district court's conclusion that Gatlinburg has not shown a Section 2 violation. There is simply no evidence that appellees' leasing practices tended to create or per-

petuate appellees' alleged monopoly position in the relevant market.

This leaves Gatlinburg's claim that appellees violated Section 1 of the Sherman Act—a claim which essentially mirrors Gatlinburg's Section 2 claim. Section 1 prohibits combinations and conspiracies that unreasonably restrain trade. *Standard Oil Co. v. United States*, 221 U.S. 1, 60, 31 S.Ct. 502, 515, 55 L.Ed. 619 (1911). The district court found that Gatlinburg had failed to demonstrate that any of appellees' conduct unreasonably restrained trade. Memorandum, Aug. 13, 1985 at 13 n. 14. We see no reason to upset this holding. In order to survive a motion for summary judgment, an antitrust plaintiff must come forward with some "significant probative evidence tending to support the complaint." *First National Bank v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968). In this case, Gatlinburg has made general allegations of restraint of trade, but has not supported these allegations with any concrete evidence. *See* Complaint ¶ 24, filed July 15, 1977. We therefore conclude that the district court properly dismissed Gatlinburg's Section 1 claim.

## III. CONCLUSION

For the reasons stated above, we vacate that portion of the district court's May 22, 1985 Memorandum Order in which it ordered appellants to pay additional interest. We affirm the district court's decisions in all other respects. Perhaps this long litigation can finally end, leaving the parties to pursue more fruitful enterprises than vociferously litigating disputes about figures who themselves are markedly mute.